United States District Court
Southern District of Texas

**ENTERED**

April 20, 2017

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| CAMELIA CHAPA, on behalf of herself and all others similarly situated, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| VS. | § | CIVIL ACTION NO. 7:16-CV-608 |
| | § | |
| CENTENE COMPANY OF TEXAS, L.P. d/b/a CENTENE-SUPERIOR HEALTH, | § § | |
| Defendant. | § | |

**ORDER GRANTING PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND FOR NOTICE TO POTENTIAL OPT-IN PLAINTIFFS**

**I.    Background**

Now before the Court is the "Motion for Conditional Certification and for Notice to Potential Opt-In Plaintiffs" filed by Plaintiffs Camelia Chapa, Veronica Trevino, and Neri Rodriguez.  (Dkt. No. 18).[1]  On October 19, 2016, Chapa filed this collective action on her own behalf, and on behalf of all others similarly situated, challenging the alleged failure by Defendant Centene Company of Texas, L.P. d/b/a Centene-Superior Health ("Defendant" or "Centene") to pay its hourly employees overtime wages as required by the Fair Labor Standards Act ("FLSA").  (Dkt. No. 1).  Chapa's Original Complaint alleges that Defendant "is an affiliate of Centene Corporation, a Fortune 500 multi-national healthcare enterprise that provides a portfolio of services to government-sponsored healthcare programs, focusing on under-insured and uninsured individuals."  *Id.* at ¶ 6.  Defendant employs Chapa in McAllen, Texas as a Program Coordinator, in which capacity she "typically spends her workweek…creating and handling

---

[1]  Chapa filed her written notice of consent to participate in this collective action on October 19, 2016, the date she filed the Original Complaint.  (Dkt. No. 1-1).  Trevino and Rodriguez later joined the collective action by filing their written notices of consent on October 31, 2016.  (Dkt. Nos. 4-1, 4-2).

authorization documents for members of Centene's STAR+PLUS Program regarding provider services for home health care, emergency response departments, adult day-care facilities and meal delivery services, verifying eligibility of each member joining STAR+PLUS for the aforementioned services as well as related clerical and data entry duties." *Id.* at ¶¶ 8, 9. According to Chapa, Defendant (through its supervisors) requires her to perform work for Centene's benefit before "clocking-in" for the day, during her unpaid lunch period, and after "clocking-out" for the day, and does not compensate her for any of this work. *Id.* at ¶¶ 14-16. Since Chapa's "reported hours regularly meet and exceed forty (40) hours per week, these unreported and unpaid hours result in the denial of overtime pay to Chapa." *Id.* at ¶ 17. Chapa further alleges that Defendant has employed many other hourly employees in the McAllen office over the last three years, and that these hourly employees perform(ed) the same or similar job duties as Chapa. *Id.* at ¶¶ 19, 21. "At all times," Defendant allegedly "paid these other Program Coordinators in the same manner as [it] paid Chapa, including failing and refusing to pay these other Program Coordinators at one-and-one half times their regular rates for all the hours they worked in excess of forty (40) hours in a workweek." *Id.* at ¶ 21. Through the collective action, Chapa seeks to recover from Defendant the unpaid and/or underpaid overtime compensation owed to her and others similarly situated, liquidated damages, attorneys' fees, and costs under the FLSA. *Id.* at ¶¶ 23-33, Prayer.

Trevino and Rodriguez have since joined the collective action by filing their written notices of consent with the Court. *See supra* n. 1. Through the instant Motion, all three Plaintiffs now ask that the Court conditionally certify the action as a collective action under the FLSA, and that the Court authorize the issuance of notice to potential "opt-in" plaintiffs of their right to join the suit. (Dkt. No. 18). As discussed *infra*, the proposed "class" of potential

plaintiffs reflects a narrowing of Chapa's original allegations, in that it includes only Program Coordinators employed by Defendant at its McAllen office, who at any time were supervised by a single individual.  Upon consideration of the Motion and responsive briefing and evidence (Dkt. Nos. 19-22), in light of the relevant law, the Court finds that the Motion should be granted for the following reasons.

## II.   Overview of Applicable Law

Relevant to this case, the FLSA requires that any non-exempt, hourly employee who works more than 40 hours in a workweek be compensated by her employer for any additional hours worked, at a rate not less than one and one-half times the employee's "regular rate."  29 U.S.C. § 207(a)(1).  Relevant to this case, § 216(b) of the FLSA also gives an employee the right to bring suit against her employer, "for and in behalf of [herself]…and other employees similarly situated," to recover unpaid overtime compensation.  *Id.* § 216(b).  "No employee shall be a party plaintiff to any such action unless [s]he gives [her] consent in writing to become such a party and such consent is filed in the court in which such action is brought."  *Id.*  The Fifth Circuit has observed that this language establishes an "opt-in" scheme (as opposed to the "opt-out" procedure for class actions under Federal Rule of Civil Procedure 23), under which plaintiffs must affirmatively notify the court of their intention to become parties to a § 216(b) collective action.  *E.g.*, *Romero v. J&F Analysts, Inc.*, 2016 WL 612594, at *2 (S.D. Tex. Feb. 16, 2016) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995) (ADEA case), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)).[2]  Also in contrast to Rule 23, § 216(b) does not provide for class certification or court-authorized notice, but district courts have the discretion to certify an FLSA action brought on behalf of "similarly

---

[2]  *Mooney* involved a collective action brought pursuant to the Age Discrimination in Employment Act ("ADEA"), but is instructive given that the ADEA explicitly incorporates § 216(b) of the FLSA.  *See Mooney*, 54 F.3d at 1212.

situated" employees as a collective action, and to implement the opt-in procedure by facilitating notice to potential plaintiffs. *See id.*; *Jones v. Cretic Energy Servs., LLC*, 2015 WL 8489978, at *2 (S.D. Tex. Dec. 9, 2015) (citing *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (ADEA case)). "Because collective actions may reduce litigation costs for the individual plaintiffs and create judicial efficiency, courts favor collective actions when common issues of law and fact arise from the same alleged activity." *Jones*, 2015 WL 8489978, at *3 (citing *Sperling*, 493 U.S. at 170).

The Fifth Circuit has yet to adopt an approach for determining whether employees' claims are sufficiently similar to proceed as a collective action. *See Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 519 n.1 (5ᵗʰ Cir. 2010). However, most courts, including those in this district, follow a two-step approach consisting of (1) a notice stage followed by (2) a decertification stage. *E.g.*, *Romero*, 2016 WL 612594, at *2 (citing cases). "At the notice stage, the court makes a decision—usually based only on the pleadings and any affidavits which have been submitted—whether notice of the action should be given to potential class members." *Mooney*, 54 F.3d at 1213-14. "Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class." *Id.* at 1214. "[C]ourts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan...." *Id.* at 1214 n.8 (quoting *Sperling v. Hoffman-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988), *aff'd in part and appeal dismissed in part*, 862 F.2d 439 (3d Cir.1988), *aff'd and remanded*, *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165 (1989)). To meet her burden at this stage, a plaintiff typically must show that (1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist; (2) those aggrieved individuals are

similarly situated to the plaintiff in relevant respects given the claims and defenses asserted; and (3) those individuals want to opt in. *E.g.*, *Romero*, 2016 WL 612594, at *3 (citing cases). If the district court conditionally certifies the class, potential class members are given notice and the opportunity to opt in, and the action proceeds as a collective action throughout discovery. *Mooney*, 54 F.3d at 1214.

The second stage "is typically precipitated by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial." *Id.* With more information on which to base its decision, the court makes a final determination as to whether class members are similarly situated. *Id.* If they are, the collective action proceeds to trial. *Id.* If they are not, the court decertifies the class and dismisses the opt-in plaintiffs without prejudice, and the original plaintiff proceeds to trial on her individual claims. *Id.*

## III.   Analysis

### A.   Overview of Plaintiffs' Evidence

In support of the Motion, Plaintiffs offer sworn declarations attesting to the following facts. (Dkt. No. 18, Attachments 1-3). Centene is in the healthcare business providing a portfolio of services to government-sponsored healthcare programs focusing on under-insured and uninsured individuals. *Id.* at ¶ 2. Plaintiffs work as Program Coordinators for Centene in its McAllen office. *Id.* Trevino and Rodriguez have worked in that capacity since March 9, 2015, and Chapa since April 6, 2015. *Id.* As Program Coordinators, Plaintiffs' regular job duties consist of creating authorizations (referred to as "auths" for short) for Centene's members/clients to receive provider attendant, adult daycare, emergency response, and home-delivered meal services from provider agencies. *Id.* at ¶ 3. Each Plaintiff also attests to additional job duties: Chapa verifies member/client eligibility for services and negotiates the start date for services;

Trevino makes arrangements with provider agencies if the member/client wants to change facilities or add or increase services, and updates member/client files to reflect any changes; and Rodriguez "assist[s] with Recon which is the billing side of Centene," and responds to emails for urgent services. *Id.*

 Plaintiffs are paid by the hour and track their hours by clocking-in and clocking-out on Centene's computer system. *Id.* at ¶ 4.  During the course of their employment, their hourly rates have spanned the range of $15.00 to $15.86. *Id.* at ¶ 4.  They are scheduled to work 40 hours per week, and more specifically, Monday through Friday from 8:00 a.m. to 5:00 p.m., with an unpaid hour for lunch and two 15-minute paid breaks. *Id.* at ¶ 5.  Plaintiffs also have daily quotas of "auths" they must complete, ranging from 15 to 20 per day. *Id.* at ¶ 3.[3]  Depending on what it involves, a single "auth" can take an hour or more to complete, "although not all of them take that long." *Id.*

Starting around mid-2015, Plaintiffs' supervisor at the McAllen office was Joanna Barrera.  (Dkt. No. 18, Attachments 1 & 2 at ¶ 5; *see also* Attachment 3 at ¶ 5).  Chapa attests that Barrera's job performance depended in part on whether her department was meeting its daily quota numbers.  (Dkt. No. 18, Attachment 1 at ¶ 5).  Barrera routinely threatened the Program Coordinators that they had to meet and exceed their "auths" quota or they could be disciplined or fired—a threat she carried out with respect to Chapa and Trevino, who were both disciplined. (Dkt. No. 18, Attachments 1-3 at ¶ 6).  Barrera would tell Program Coordinators to do whatever they needed to do to meet their quotas, and in Chapa's case, to keep her job. *Id.*  Chapa and Trevino claim that Barrera told the Program Coordinator team lead, Joleen Garcia, that if the Program Coordinators were smart they would work "off the clock" to meet their numbers.  (Dkt.

---

[3]  Chapa states that her current quota is 15 "auths" per day, and that her quota has been as high as 20 in the past; Trevino states that her quota is 20 per day; and Rodriguez states that her quota used to be 15 per day, and now is 20.  (Dkt. No. 18, Attachments 1-3 at ¶ 3).

No. 18, Attachments 1 & 2 at ¶ 6).[4]  Rodriguez also claims that Barrera pointed to Program Coordinator Yolanda Villanueva, who was working off the clock, as an example of what Barrera meant by "doing what had to be done to make quota."  (Dkt. No. 18, Attachment 3 at ¶ 6). According to Rodriguez, Barrera also told the Program Coordinators that if they stayed clocked-in after hours, their "auths" quotas would increase.  *Id.*  As a result, Plaintiffs and the other Program Coordinators routinely worked hours off the clock—that is, before or after clocking out for the day, or at lunch—without compensation.  (Dkt. No. 18, Attachments 1-3 at ¶¶ 5-7).  At any given time during Plaintiffs' employment, Centene has employed 15 to 18 Program Coordinators in the McAllen office, a number of whom Plaintiffs identify by name.  *Id.* at ¶ 7. According to Plaintiffs, they know from working with and talking to these other Program Coordinators that they shared the same job duties, were paid in the same way (albeit at varying hourly rates), and had to work off the clock just as Plaintiffs did.  *Id.*

## B.    Overview of Defendant's Evidence

In response to the Motion, Defendant relies on the sworn declarations and attached exhibits submitted by: Trevan Ross, Defendant's Vice-President of Human Resources "responsible for Centene's human resources activities throughout Texas"; and Brian Farrington, an attorney hired by Defendant in December 2016 to perform an independent investigation of Chapa's internal employee complaint about off-the-clock work.  (Dkt. No. 20 at ¶¶ 2, 4; Dkt. No. 21 at ¶ 2).

Ross's declaration explains Centene's business and its timekeeping and overtime practices, policies, and procedures, and also addresses Plaintiffs' allegations of off-the-clock work while supervised by Barrera.  Ross attests that Centene is a managed care company that

---

[4]  Chapa attests that she heard Barrera make this statement, and Trevino attests that Joleen Garcia told her what Barrera had said.  (Dkt. No. 18, Attachments 1 & 2 at ¶ 6).

provides Medicaid, Medicare, and marketplace health insurance plans for under-insured and uninsured individuals in Texas. (Dkt. No. 21 at ¶ 3). One of those health plans is STAR+PLUS, a Medicaid managed care program serving low-income disabled or elderly individuals. *Id.* Ross acknowledges that between May 2015 and October 2016,[5] Barrera supervised a team of approximately 15 Program Coordinators in McAllen, including Chapa, Trevino, and Rodriguez. *Id.* at ¶ 4. Barrera has not worked for Centene since October 2016. *Id.*

Ross attests that Centene's employees record their work time on a daily basis using the "ADP Time and Attendance System." *Id.* at ¶ 5. Each pay period, employees are required to review their timecards for accuracy and submit any corrections. *Id.* When they begin employment, Centene's employees receive a copy of the Employee Handbook setting forth the company's policy on timekeeping. *Id.* at ¶ 6, Exh. A. The Handbook provides that non-exempt employees must record "all actual time worked," regardless of their scheduled hours. *Id.* at Exh. A. Any corrections made must be verified electronically by the employee and supervisor. *Id.* Centene also maintains Human Resources ("HR") Policies and Procedures, which are available to employees on "CNET," the company's intranet. *Id.* at ¶ 7. The HR Timekeeping Policy states that "[w]orking 'off the clock' is prohibited," and the HR Timekeeping and Overtime Policies both provide:

> It is a violation of the Company's policy for anyone to instruct or encourage another employee to work "off the clock," to incorrectly report hours worked, or to alter another employee's time records (except for authorized adjustments made by a supervisor). If any employee is directed or encouraged to incorrectly report hours worked, or to alter another employee's time records, he or she should immediately report the incident to a supervisor or Human Resources.

*Id.* at Exh. B, pp. 2 & 4 of 6; Exh. C, p. 2 of 2. The HR Timekeeping Policy further states that

---

[5]  Ross's declaration states October 2015, but given his later statements, and the fact that Defendant's own response operates under the assumption that Barrera's supervision of Program Coordinators at the McAllen office spanned a 17-month period, this appears to be a typographical error. *See* (Dkt. No. 19 at p. 14).

"[e]very report about timekeeping or pay practices will be fully investigated." *Id.* at Exh. B, p. 4 of 6.  In compliance with the HR Overtime Policy, Centene's non-exempt employees in Texas are paid one and one-half times their regular rate of pay for all hours worked in excess of 40 in a workweek. *Id.* at ¶ 9; Exh. C, p. 1 of 2.  According to Ross, employees receive training on these HR Policies through Centene's "New Hire Orientation" when they are hired, and managers receive training through Centene's "Fundamentals of Management Training" when they are hired or promoted. *Id.* at ¶ 10.  Employees have multiple avenues for making complaints about timekeeping and pay practices, including HR, their direct supervisor or higher-level manager, or Centene's third-party telephone hotline. *Id.* at ¶ 12.  These avenues are discussed in the New Hire Orientation and reiterated in Centene's written policies on CNET. *Id.*  Ross receives notice of any complaint made through the hotline, and his department "ensures that all complaints are investigated thoroughly and appropriate action is taken depending on the findings of the investigation." *Id.*

Ross further attests that between May 2015 and October 2016—that is, the period of time when Barrera supervised the Program Coordinators at the McAllen office—Chapa recorded 144.35 hours of overtime, Trevino recorded 238.8 hours of overtime, and Rodriguez recorded 287.59 hours of overtime, and all were paid for these overtime hours at one and one-half times the regular rate of pay. *Id.* at ¶ 11.  He claims that no complaint about off-the-clock work was made by any employee in McAllen, including Chapa, prior to the filing of the lawsuit. *Id.* at ¶ 13.  Rather, Chapa first made an internal employee complaint about off-the-clock work to her manager in December 2016, after she filed suit. *Id.*  Chapa's complaint was "escalated" by the manager to HR, at which time Centene retained outside investigator Farrington. *Id.*

Farrington's declaration confirms his hiring by Centene in December 2016 to investigate

Chapa's internal employee complaint, and states that he began the investigation in January 2017. (Dkt. No. 20 at ¶ 4).  As part of his practice as an attorney, Farrington is regularly retained by clients to perform independent investigations of wage-and-hour compliance.  *Id.* at ¶ 2. Previously, he worked for the U.S. Department of Labor as an Investigator and then Assistant District Director, in which capacities he personally conducted approximately 500 investigations and supervised approximately 5,000 investigations regarding compliance with the requirements of the FLSA.  *Id.* at ¶ 3.  From January 10 to 11, 2017, Farrington personally interviewed the Program Coordinators in the McAllen office (with the exception of four who were absent), including Chapa, Trevino, and Rodriguez in the presence of their counsel in this case.  *Id.* at ¶¶ 5, 9.  Prior to each interview, he read an "Interview Introduction" informing each employee of the cause and nature of the investigation and interview.  *Id.* at ¶ 6, Exh. 1.  During the interview, he contemporaneously wrote a statement to document the conversation.  *Id.* at ¶ 7.  After the interview, he reviewed that statement with the employee, made any corrections to ensure accuracy, and asked the employee to sign it.  *Id.*  Chapa, Trevino, and Rodriguez declined to sign statements.  *Id.*  Copies of the handwritten and signed statements Farrington collected, as well as the typed versions prepared by his assistant under his direction, are attached as an exhibit to his declaration.  *Id.* at ¶ 8, Exh. 2.  Farrington states that he intends to interview the four Program Coordinators who were absent, and therefore his investigation is still in process.  *Id.* at ¶ 9.

In support of its contention that the seven interviewees other than Plaintiffs accurately recorded their time in Centene's ADP electronic timekeeping system, did not work off the clock, and were paid for all overtime hours worked, Defendant's response points to the following portions of the interview statements collected by Farrington:

**Statement of Guillermo Almanza (p. 7):**
- "I clock in at 8:00 am when I begin to work. My computer has an ADP app. I clock in on the ADP window....  I would not work before 8, during lunch or after 5:00 pm without [my lead Jolene Garcia's] approval. All this time would be on the clock."
- "I do not work without my time being recorded and paid for....  When I work over 40 hours in a week I get time and a half for the overtime. I have never heard any co-worker say they have worked off the clock or been asked to or told to work off the clock."

**Statement of Mary Lou Chavez (p. 10):**
- "I record my work hours on the computer using ADP. I sign in in the morning, out for lunch, in after lunch, and out at the end of the day."
- "I do not work off the clock.... I have not heard any other employees talking about working off the clock. I've never been asked to work off the clock[.]"

**Statement of Jolene Garcia (p. 13):**
- "There is an ADP portal on our computer where we sign in or out. So when I come in in the morning I sign in on the ADP portal, before I do any work. I sign in and out for lunch. I don't do any work in the evening after I sign out."
- "All the time I work is on the clock and I am paid for all the time I work.  I even sign in to work from home. I get paid time and a half when I work over 40 hours in a week.... I have never been asked to work off the clock, and to my knowledge no one has asked any employees to work off the clock. If anyone had worked off the clock they would be doing it in violation of company policy."

**Statement of Ruby Montemayor (p. 17):**
- "When I come in, I have to turn on the computer and the first window I open is the ADP, so I clock in. I do not work before I clock in. I clock in and out for lunch. I do not do work at lunch. Supervisors or team leaders go around and see that we don't work at lunch. At the end of the day, I do not work after I clock out."
- "I have worked overtime on two occasions. I got time and a half for hours over 40. I have not heard other employees talking about working off the clock. No one has ever asked me to work off the clock."

**Statement of Mirta Ramos (p. 20):**
- "We record our time by clocking in and out of the ADP app on our computer. So when I come in in the morning I click on the ADP app and clock in. Also clock out and in for lunch and out at the end of the day....  All my work time is recorded and paid for."
- "I have never worked any time off the clock....  When I work over 40 hours in a week I get time and a half for overtime.... No one has ever asked me to work off the clock and I've never heard of any supervisor asking people to work off the clock."

**Statement of Flor Rangel (p. 23):**
- "I record my time by clocking in on the ADP system on my computer.  Clocking in is my first thing I do–I do not do any work before I clock in....  I clock out for lunch and clock back in when I return from lunch.... I clock out when I stop working. I never do any work after I clock out."
- "I have never worked any hours for which I was not paid. If I work over 40 hours I get overtime at time and a half. I have not heard anyone say they worked off the clock."

**Statement of Yolanda Villanueva (p. 26):**
- "I have never worked off the clock. I have never been asked to work off the clock. I've never heard from other employees that they worked off the clock."

(Dkt. No. 20, Exh. 2; *see* Dkt. No. 19 at pp. 5-7).

**C.  Do Aggrieved, Similarly Situated Individuals Exist?**

**1.  Overview of Parties' Arguments**

In the present case, the first two factors guiding the Court's determination at the notice stage are most easily addressed in tandem: (1) whether a reasonable basis exists for crediting the assertion that aggrieved individuals exist; and (2) whether those aggrieved individuals are similarly situated to Plaintiffs in relevant respects.  Plaintiffs contend that they have sufficiently shown, for purposes of this inquiry, that they and other Program Coordinators employed by Centene in its McAllen office, and who at any time worked under Barrera, were similarly situated in their job duties and the manner in which they were paid, and similarly aggrieved by Centene's failure to pay them for off-the-clock, overtime work.  (Dkt. No. 18).  At this stage, Defendant has not attempted to dispute Plaintiffs' contention that to the extent Barrera required (or encouraged) Plaintiffs and the other Program Coordinators she supervised to work unpaid, off-the-clock, overtime hours in order to complete their quotas, such a practice may be attributed to Defendant as a violation of the FLSA.  *See* (Dkt. No. 18 at p. 4) (citing *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 827–28 (5th Cir. 1973) (where employees' immediate supervisors insisted that all work be completed within certain defined time limits and "the

pervasive effect of such instructions…was that an employee was limited in the number of hours he could turn in for payroll purposes irrespective of the number of hours actually worked," company had constructive knowledge of unreported overtime hours and could be found to have violated FLSA)).  For purposes of the present Motion, however, Defendant asserts that Plaintiffs have not met their burden to show that other Program Coordinators were similarly aggrieved by any such practice, or that they are similarly situated to Plaintiffs, for the following reasons: (1) Plaintiffs' declarations are too conclusory to meet their burden; (2) the seven Program Coordinators interviewed by Farrington stated that they have never worked off the clock; (3) Centene maintains and enforces lawful policies prohibiting off-the-clock work; (4) Program Coordinators, including Plaintiffs, followed these policies by reporting and receiving payment for "significant" overtime hours; and (5) Program Coordinators' job duties and need to work overtime hours to complete their quotas vary by individual.  (Dkt. No. 19).  The Court will examine each of these arguments in turn.

**2.  Plaintiffs' Declarations**

Defendant contends that Plaintiff Chapa's declaration "surmises, without any personal knowledge and based exclusively on alleged conversations she overheard or general observations of other employees working, that her co-workers worked outside of their regular hours without pay." (Dkt. No. 19 at p. 11).  Defendant further asserts that Plaintiff Trevino's and Plaintiff Rodriguez's declarations "suffer from the same deficiencies."  *Id.*  According to Defendant, these "conclusory allegations reflecting Plaintiff[s'] belief that other workers were subject to a common illegal policy are insufficient to meet Plaintiff[s'] burden."  *Id.* at p. 10.

In addressing Defendant's argument, the Court must be mindful that "[m]otions for conditional certification of collective actions are nondispositive pretrial matters," and that courts

have declined to scrutinize supporting evidence as they would at the dispositive motion and trial stage. *Vargas v. HEB Grocery Co.*, 2012 WL 4098996, at *1-2 (W.D. Tex. Sept. 17, 2012) (denying defendant's motion to strike "conclusory statements and inadmissible hearsay" contained in declarations offered by plaintiffs at conditional certification stage); *see also Lee v. Metrocare Servs.*, 980 F. Supp. 2d 754, 761 (N.D. Tex. 2013) (plaintiffs "need not present evidence in a form admissible at trial at the notice stage") (citing cases). Plaintiffs contend, and the Court accepts, that "[t]his somewhat relaxed approach to the admissibility standards is appropriate at this stage because," as *Vargas* noted, the conditional certification decision "is merely a preliminary one, and may be modified or reversed after discovery." (Dkt. No. 22 at p. 13); *Vargas*, 2012 WL 4098996, at *2. The Court is also mindful, as Defendant emphasizes, that "employers should not be unduly burdened by a frivolous fishing expedition conducted by the plaintiff at the employer's expense." *Songer v. Dillon Res., Inc.*, 569 F. Supp. 2d 703, 707 (N.D. Tex. 2008) (quoting *Lentz v. Spanky's Rest. II, Inc.*, 491 F. Supp. 2d 663, 669 (N.D. Tex. 2007)). Therefore, the Court must strike a balance between considering Plaintiffs' evidence under a lenient standard, and ensuring that conditional certification would not constitute an undue burden to Defendant. The Court concludes, upon consideration of Plaintiffs' declarations and the cases cited by the parties, that the balance tips in Plaintiffs' favor.

Defendant cites to five district court cases within this Circuit as support for its contention that Plaintiffs' allegations are too conclusory to carry their burden, but the Court finds that Plaintiffs' statements do not suffer from the same infirmities identified in the cited authority. *See* (Dkt. No. 19 at pp. 10-11). In contrast to *Aguirre v. SBC Commc'ns, Inc.*, 2006 WL 964554, at *6 (S.D. Tex. 2006), in which the plaintiffs failed to support their request for conditional certification with "affidavits or other information beyond the brief and conclusory statements in

the complaint and motion for notice," Plaintiffs have in fact submitted sworn declarations. Plaintiffs' declarations also stand in contrast to the evidence found deficient in *H&R Block, Ltd. v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999), in which the movants' affidavits simply stated "that they believe other workers were discriminated against in similar ways[.]"

In the remaining three cases cited by Defendant, the proposed classes of former and current employees were potentially numerous, and the plaintiffs had insufficient personal knowledge to attest that potential class members were similarly situated and aggrieved by a single policy of denying overtime pay.  That is, in *Songer*, 569 F. Supp. 2d at 707, the plaintiff sought to conditionally certify a class of "all individuals employed by defendants as truck drivers," on the basis of affidavits containing "primarily conclusory allegations unsupported by any factual assertions demonstrating the basis of the affiants' knowledge."  For example, the affidavits stated that "[a]ll drivers for [defendants] are working overtime because anyone who fails to complete an assigned delivery will lose his minimum guarantee in a later week where there is no work," and that "[a]t no time has the company ever converted the drivers' pay per load into a regular hourly rate, and then paid for the hours in excess of forty (40) at one and a half times this rate."  *Id.*  Since the affidavits contained "nothing to establish that the plaintiffs have personal knowledge of those matters as they pertain to any other driver," the court found them insufficient to meet the plaintiffs' burden.  *Id.*  In *Clark v. City of Ft. Worth*, 800 F. Supp. 2d 776, 778 (N.D. Tex. 2011), the same court denied the plaintiffs' request for conditional certification of a class of all current and former police officers who had worked more than 40 hours in any given week at a convention center owned by the defendant.  The plaintiffs' affidavits attested that they scheduled other officers for special events at the center, but not to any facts that would establish personal knowledge that others on the list of over 200 officers used

to staff convention center events were similarly denied overtime pay for hours worked at the convention center. *Id.* at 780. Finally, in *Simmons v. T-Mobile USA, Inc.*, 2007 WL 210008, at *1, 7-8 (S.D. Tex. Jan. 24, 2007), the plaintiff sought to certify a class of all current and former senior retail sales representatives ("SRSRs") employed by the defendant at its 113 stores in Texas, by relying on his affidavit concerning his own experience at one of those stores, and affidavits obtained from employees who held job positions different than his own. Not surprisingly, the court found that the plaintiff's "own personal observations are insufficient in the circumstances of this case (with 113 different T-Mobile locations and over a hundred supervisors) to constitute meaningful proof, even under a lenient standard," of the existence of a class of aggrieved, similarly situated SRSRs. *Id.* at *8.

Here, Plaintiffs seek conditional certification of a discrete, far less numerous class of Program Coordinators who worked at the same location under the same supervisor. Further, Plaintiffs' declarations dated January 2017 state that they were employed as Program Coordinators at the McAllen office from March or April 2015 to the present, and Ross's declaration attests that Barrera served as supervisor there from May 2015 to October 2016. Therefore, if Defendant's evidence is to be credited, Plaintiffs' employment spanned the entirety of Barrera's time as supervisor, and all potential class members would have worked with Plaintiffs. Thus, the Court accepts that in contrast to the plaintiffs in *Songer*, *Clark*, and *Simmons*, Plaintiffs in the present case were better able "to observe first-hand what took place at their work place and which other employees were affected by the off-the-clock policy." (Dkt. No. 22 at p. 16). Again, Plaintiffs' declarations attest that Barrera: (1) routinely threatened the Program Coordinators that they had to meet their quotas or they could be disciplined or fired; (2) would tell the Program Coordinators to do whatever they needed to meet their quotas, and

offered a Program Coordinator who worked off the clock as an example of what she meant; (3) told the Program Coordinator team lead that if the Program Coordinators were smart, they would work off the clock; and (4) told the Program Coordinators that if they stayed clocked-in after hours, their quotas would increase.  Thus, Plaintiffs' more generalized statements that they know, from working with and talking to these other Program Coordinators, that they had to work off the clock just as Plaintiffs did, are not lacking in the type of factual foundation required at the conditional certification stage.  *See* (Dkt. No. 22 at pp. 14, 16) (citing *Villarreal v. St. Luke's Episcopal Hosp.*, 751 F. Supp. 2d 902, 912 (S.D. Tex. 2010) (overruling in part objections to plaintiff's statements about what other employees told him, since even if they could not be considered for the truth of the matter asserted, such statements "provide a basis for Plaintiff's belief that aggrieved individuals exist who may be owed overtime compensation"); *Villatoro v. Kim Son Rest., L.P.*, 286 F. Supp. 2d 807, 811 n.8 (S.D. Tex. 2003) (considering plaintiff's statement that he knew from his discussions with other employees that they were also paid a flat amount for each week's work and were not paid overtime, "for the limited purpose of deciding if notice under a FLSA collective action procedure is appropriate").  Moreover, since Plaintiffs' and Ross's declarations reflect that Barrera supervised approximately 15 Program Coordinators at the McAllen office at any one time, and that she did so beginning in May 2015 and (according to Defendant) ending in October 2016, the Court finds that conditional certification of this narrow class of employees would not impose an undue burden on Defendant.

3.     **Declarations of Program Coordinators Interviewed by Farrington**

Defendant also contends that "contrary to Plaintiff[s'] assertions, many of the putative collective action members have already sworn to an independent investigator that they never performed any off-the-clock work," and therefore "there is no widespread policy to support

conditional certification in this case." (Dkt. No. 19 at p. 13).  The Court first observes that of the seven Program Coordinators interviewed by Farrington in January 2017, one was hired in October 2016, and therefore according to Defendant's own evidence, the same month Barrera stopped working for Defendant.  *See* (Dkt. No. 20 at p. 17).  Thus, if this employee was never supervised by Barrera, her declaration is irrelevant to the Court's inquiry.  The Court also observes that of the 13 Program Coordinators identified by name in Plaintiffs' declarations as potential class members, only four—Jolene Garcia, Mirta Ramos, Flor Rangel, and Yolanda Villanueva—gave statements to Farrington.  Moreover, as Plaintiffs point out, Ramos's declaration actually states, "I have heard other employees say that they stayed for over 30 minutes to complete their quotas off the clock," thus providing support for Plaintiffs' allegations that other Program Coordinators were similarly affected by a policy of requiring off-the-clock work.  (Dkt. No. 20 at p. 20; Dkt. No. 22 at pp. 10-11).

The Court also recognizes, as Plaintiffs emphasize, that the conditional certification stage is not "an opportunity for the court to assess the merits of the claim by deciding factual disputes or making credibility determinations."  *McKnight v. D. Houston, Inc.*, 756 F. Supp. 2d 794, 804 (S.D. Tex. 2010) (citing cases); *see also Villatoro*, 286 F. Supp. 2d at 811 (refusing to consider defendant's objections relevant to merits of action in determining whether notice to potential claimants should be given).  Defendant implicitly concedes as much, but claims that the Court may consider its Program Coordinator declarations in determining whether sufficient evidence exists of a "widespread policy of off-the-clock work." (Dkt. No. 19 at pp. 13-14).

The declarations of Jolene Garcia and Yolanda Villanueva underscore the difficulty with Defendant's position.  Whereas Garcia's declaration states that to her knowledge, "no one has asked any employees to work off the clock," Plaintiffs' declarations identify a "Joleen" Garcia

who they claim was privy to a statement by Barrera encouraging off-the-clock work.  Although Villanueva's declaration denies working off the clock, Plaintiffs attest than an employee by the same name worked off the clock and was held up as an example by Barrera.  Were the Court to resolve these conflicts in Defendant's favor, it would be making impermissible credibility determinations.  Yet in arguing that the Court may accept Garcia's and Villanueva's declarations as evidence that no widespread illegal policy exists, Defendant is asking the Court to do just that. The Court concludes that the declarations of other Program Coordinators interviewed by Farrington subsequent to Plaintiffs' filing of this suit, and in his capacity as an investigator for the party being sued, do not carry the weight that Defendant suggests.

**4.    Centene's Polices**

Defendant's next argument requires only brief mention.   Even crediting Centene's assertions that it strictly enforces and trains its employees and managers on its Timekeeping and Overtime Policies, which prohibit off-the-clock work, that it offers "several avenues to make complaints about pay practices" that were not utilized by any Plaintiff prior to the filing of this suit, and that it responded quickly to Plaintiff Chapa's later-filed internal complaint, such evidence does not discredit Plaintiffs' allegations that Barrera acted in *contravention* of Centene's Policies by requiring Program Coordinators to work unpaid, off-the-clock, overtime hours.  (Dkt. No. 19 at pp. 12-13).  In fact, Defendant recognizes as much by stating that Plaintiffs' "only hope" of proving that she and other McAllen Program Coordinators were the victims of a single illegal policy "is to show that there is some other secret policy that contravenes the Company's express lawful policy."  *Id.* at p. 12.  Defendant takes the position that the declarations obtained by Farrington, and the evidence that Plaintiffs utilized Centene's lawful Policies to be paid for their overtime hours, extinguish this hope.  *Id.* at pp. 12-13.  The

Court has already explained why the declarations fail to do so, and for the reasons explained herein, finds similarly with respect to evidence that Plaintiffs received overtime pay.

**5.      Centene's Payment of Overtime to Plaintiffs and Other Program Coordinators**

Defendant asserts that "[n]ot only did [Centene] have a lawful policy that provided for the reporting and payment of overtime, it is uncontroverted that Plaintiff Chapa and the two opt-in Plaintiffs (and the other Program Coordinators) *actually utilized* [Centene's] lawful policy to report and be compensated for overtime hours."  (Dkt. No. 19 at p. 14) (emphasis in original).  In making this claim, Defendant points to its own evidence that Plaintiffs Chapa, Trevino, and Rodriguez reported and were paid for 144.35, 238.8, and 287.59 hours of overtime, respectively, during the approximately 17-month period when Barrera supervised them.  *Id.*  Defendant also points to the declarations obtained by Farrington, in which the Program Coordinators state that they received payment for overtime hours.  *Id.*  According to Defendant, "[t]his alone shows that [Centene] does not have a common policy of encouraging employees to work off the clock because it *does* pay substantial overtime."   *Id.* (emphasis in original).  Again, Defendant's arguments essentially require the Court to wade into a merits inquiry.  Moreover, even if that were appropriate, the Court agrees with Plaintiffs that "Centene's evidence on this point only goes to show that it paid its Program Coordinators for overtime hours that were reported," and does not disprove that Barrera required (or encouraged) Plaintiffs and other Program Coordinators to work additional, unreported overtime hours not reflected in Centene's records. (Dkt. No. 22 at p. 8).

Within its appeal to the above-cited evidence, Defendant also points to case law establishing that if an employee "fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the

overtime hours is not a violation of § 207." *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005) (quoting *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995)); *see also Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972) (court found no evidence that employer encouraged workers to falsely report hours, and therefore employee who understated number of hours worked in order to keep her job "was estopped and could not profit from her own wrong in furnishing false data to the employer"); (Dkt. No. 19 at pp. 14-15). Defendant thus claims that "the fact that Plaintiff[s] and putative collective action members frequently utilized [Centene's] lawful policy to report and be compensated for overtime necessarily leads to a number of additional individualized inquiries" relevant to Defendant's pleaded estoppel defense, such as: (1) "whether each employee advised management that he or she had worked overtime on each occasion"; (2) "why they reported working overtime on some occasions, but not all of the time"; (3) "whether they claim that there are additional overtime hours they worked but for which they were not paid"; and (4) "what [Centene] management knew or should have known in relation to each day during which each Plaintiff and putative collective action member claims he or she was not properly compensated." (Dkt. No. 19 at p. 15; *see* Dkt. No. 11 at ¶¶ 19, 20).

Again, the proposed class to whom notice would be sent consists only of those Program Coordinators supervised by Barrera during a specified time period, and the Court observes that the proposed notice invites these persons to "opt in" to the class if they desire to make a claim for unpaid wages "based on the…theories or claims" asserted by Chapa: that Chapa's "former supervisor, Joanna Barrera, coerced her into working 'off-the-clock' hours in order to make her daily quota numbers and that she was not paid for these 'off-the-clock' hours." (Dkt. No. 18-5 at p. 1). Conceivably, on the basis of Defendant's evidence, Program Coordinators who received

compensation for all overtime hours worked could receive such notice, but have no reason to opt in.  However, at this early stage, the Court finds that the record supplies a reasonable basis for crediting Plaintiffs' assertion that other Program Coordinators worked unpaid, unreported overtime hours (in some cases, in addition to reported overtime hours for which they were paid) because they were "coerced" by Barrera to do so.  With respect to these Program Coordinators, who would have reason to join the collective action, Defendant's estoppel defense would apply (or fail) equally as to all.  In sum, the Court concludes that this defense does not pose the danger of individualized inquiries with respect to members of the proposed class aggrieved by Barrera's alleged coercive tactics, and therefore does not counsel against conditional certification.

**6.    Variance in Program Coordinators' Job Duties and Need to Work Overtime to Complete Quotas**

Finally, Defendant asserts that the proposed class is not similarly situated because Plaintiffs themselves admit that their job duties (apart from the task of completing the required number of authorizations) differed as to each, that the quota of "auths" they were required to complete differed over time and as to each, and that the amount of time needed to meet their quotas differed as to each.  (Dkt. No. 19 at pp. 15-17).  Accordingly, a Program Coordinator's need to work overtime (paid or not) differs as to each, and Plaintiffs cannot show a class of similarly situated individuals affected by Barrera's alleged practice of encouraging Program Coordinators to work unpaid, off-the-clock, overtime hours to complete their quotas.  *Id.* Plaintiffs respond that, regardless of the job differences cited by Defendant, both parties' evidence reveals that Plaintiffs' and other Program Coordinators' job duties and manner in which they are paid are similar in the following respects: (1) their primary duty is to create authorizations for Centene's members to receive services; (2) they are paid by the hour; (3) they are regularly scheduled to work a 40-hour week, Monday through Friday, 8:00 a.m. to 5:00 p.m.;

and (4) they use the same method to report hours on Centene's computer system.  (Dkt. No. 22 at pp. 17-19); *see* (Dkt. No. 20 at pp. 7, 10, 13, 17, 20, 23, 26).

The Court acknowledges that of the Program Coordinators who would receive notice, some may have completed their quotas within their regularly scheduled work days, and had no need to resort to overtime (paid or not).  Therefore, they would have no reason to join the collective action.  However, the Court finds that a reasonable basis exists for crediting Plaintiffs' assertion that others, like Plaintiffs, had to work more than 40 hours per week to complete the quotas imposed on them, and did so without pay because Barrera coerced them to do so.  These Program Coordinators would have reason to join the collective action, and would be similarly situated to Plaintiffs in all relevant respects.

### D.      Do Aggrieved, Similarly Situated Individuals Want to Opt in?

In addressing the third factor—whether aggrieved, similarly situated individuals want to opt in to the collective action—Defendant asserts that Plaintiffs have identified no other Program Coordinator with a demonstrated interest in joining the collective action, and that this fact alone warrants denial of the Motion.  (Dkt. No. 19 at p. 17).  However, as Plaintiffs point out, both Trevino and Rodriguez joined the action after it was filed by submitting notices of consent—a factor that has been considered "persuasive evidence that a putative class does exist."  *Shaffner v. Cash Register Sales & Serv. of Houston, Inc.*, 2006 WL 1007542, at *1 (S.D. Tex. Apr. 17, 2006); (Dkt. No. 22 at p. 5).  Moreover, district courts within this Circuit are split on whether the third factor is required, and if so, on the quantum of evidence necessary to meet it.  *See*, *e.g.*, *Romero*, 2016 WL 612594, at *3 (acknowledging split and applying third factor "in the absence of a Fifth Circuit directive otherwise"); *Jones*, 2015 WL 8489978, at *4 (acknowledging split and concluding that "[b]ecause the third element is not statutorily required and because requiring

evidence of putative class members who are willing to join a collective action before an appropriate class has even been defined conflicts with the Supreme Court's directive that the FLSA be liberally construed to effect its purposes, the court agrees that plaintiff need not present evidence of the third element at [the notice stage].") (internal citation omitted); *Heeg v. Adams Harris, Inc.*, 907 F. Supp. 2d 856, 862 (S.D. Tex. 2012) (to satisfy first and third factors, plaintiff need only provide evidence that "it is reasonable to believe that there are other aggrieved employees who were subject to an allegedly unlawful policy or plan"); *Simmons*, 2007 WL 210008 at *9 (plaintiff must show, through affidavits of potential class members or other evidence, that "at least a few similarly situated individuals seek to join the lawsuit").  One court has observed that the requirement imposed by the third factor does not exist for its own sake, but is relevant to the certification analysis because it tends to show the existence of a single policy affecting putative class members.  *See Roberts v. S.B. S. Welding, L.L.C.*, 2015 WL 6438120, at *6 (N.D. Tex. Oct. 21, 2015).

Here, given the consents filed and the Court's findings concerning the existence of other aggrieved, similarly situated individuals within the proposed class, the Court agrees with Plaintiffs that "[i]t is reasonable, under these circumstances, to conclude that others would want to join if they were informed of their rights."  (Dkt. No. 22 at p. 6).

## E.    Notice

In conclusion, Defendant's response asks that "[i]n the event the Court grants Plaintiff[s'] motion for conditional certification in whole or in part," Defendant be given "an opportunity to confer with Plaintiff[s] regarding the form of proposed notice, and to submit any objections to the Court separately."  (Dkt. No. 19 at p. 18).  Plaintiffs object to this request by citing case law outside this Circuit, and also arguing that Defendant "has been afforded more than adequate time

to voice any objections to Plaintiffs' proposed notice form." (Dkt. No. 22 at pp. 19-20). Although cognizant of the statute of limitations to be applied in this case,[6] the Court finds that giving the parties a brief period within which to confer regarding the notice form, while also requiring Defendant to begin providing Plaintiffs with class members' identifying information so that notice may issue expeditiously when approved, strikes the appropriate balance.

**IV.    Conclusion**

For the foregoing reasons, the Court hereby **ORDERS**:

Plaintiffs' "Motion for Conditional Certification and for Notice to Potential Opt-In Plaintiffs" (Dkt. No. 18) is **GRANTED**;

Defendant shall provide to counsel for Plaintiffs, within 21 days of the date of this Order and in electronic, computer-readable and searchable form, the last-known names and addresses of all Program Coordinators employed by Defendant in its McAllen, Texas office, who at any time worked under Joanna Barrera; and

Also within 21 days of the date of this Order, the parties shall confer regarding the notice form to be sent to all such identified Program Coordinators, and shall submit an agreed notice form (or if unable to agree, a proposed notice form from each side) for approval by the Court.

SO ORDERED this 20th day of April, 2017, at McAllen, Texas.

Randy Crane
United States District Judge

---

[6]   The statute of limitations for an FLSA cause of action for unpaid overtime compensation is two years, except if the violation is "willful," in which case the statute of limitations is three years.  29 U.S.C. § 255(a).